UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
02-CV-976(JMR/RLE)


| | | |
|---|---|---|
| Washington Square Securities, Inc. | ) | |
| | ) | |
| v. | ) | ORDER |
| | ) | |
| Donald O. Sowers, Thelma J. Sowers, | ) | |
| Glenn B. Crabtree, and Goldie Alkire | ) | |


Plaintiff, Washington Square Securities, Inc. ("Washington Square"), asks the Court to issue a temporary restraining order[1] enjoining an arbitration proceeding.  The arbitration proceeding has commenced, and is proceeding under the auspices of the National Association of Securities Dealers ("NASD").  Plaintiff's amended complaint seeks a declaratory judgment stating it is not liable to defendants for alleged securities violations.  The declaratory judgment action is not presently before the Court; as a result, this opinion addresses only the need for emergency relief.

I.  Facts[2]

This matter comes before the Court by a circuitous route. Washington Square is a licensed brokerage firm, with its primary place of business in Minnesota.  The defendants are individual investors residing in West Virginia.  Defendants dealt with

---

[1]This matter was heard over two non-consecutive days -- May 10 and 23, 2002.  On the second date, the matter was heard as a motion for a preliminary injunction, even though no written request was submitted.

[2]At this extremely early stage of the case, the facts are necessarily uncertain and subject to reevaluation.  This section is based on the Court's present understanding, and the parties' pleadings and assertions.

FILED AUG 1 2 2002
RICHARD D. SLETTEN, CLERK
JUDGMEN' ENTD
DEPUTY CLERK

stockbroker, David H. Henderson, one of Washington Square's representatives.  Henderson acts as a Washington Square investment advisor at least most of the time.  Defendants claim they invested money with Mr. Henderson, knowing and understanding him to be acting as a Washington Square representative at all times.

In 1998, Mr. Henderson sold each defendant unregistered securities as follows:  (1) Donald O. Sowers and Thelma J. Sowers purchased a U.S. Capital Funding Inc. corporate funding note for $125,000, and invested $15,000 in 21st Century Pay Communications, Inc., wherein they purchased payphones;  (2) Glenn B. Crabtree purchased $94,409.07 in U.S. Capital Funding Inc. promissory notes; $68,250 in ETS Payphones, Inc.; $10,000 in Alpha Telecom, Inc., a similar payphone venture; and $12,000 in an Arcade Equipment Lease venture; and (3) Goldie Alkie purchased a U.S. Capital Funding Inc. promissory note for $25,000.

Washington Square emphatically denies receiving any money for these securities.  None of the defendants signed a customer agreement or independently contracted for arbitration with Washington Square.

II. Procedural History

In 2000, a number Mr. Henderson's investment clients filed an arbitration claim against Washington Square arising from Henderson's securities sales.  The arbitration complaint alleges violations of state and federal securities laws, as well as various tort and contract claims.  On May 10, 2001, the arbitration complaint was amended to include these defendants.  For reasons

2

unknown to the Court, defendants' claim was assigned to an arbitration panel located in Pittsburgh, Pennsylvania. On March 7, 2002, following defendants' belated document production,[3] Washington Square raised an objection to the arbitration panel's jurisdiction over defendants' claims. The arbitral panel, after hearing plaintiff's jurisdictional challenge,[4] found jurisdiction proper and continued the arbitration.[5]

On May 9, 2002, plaintiff filed this lawsuit. At the initial May 10, 2002, hearing, the Court asked the parties to consider whether it had personal jurisdiction over defendants, and whether Minnesota was a proper venue. By agreement of the parties, the Court continued the matter generally, without issuing an order, until May 23, 2002, allowing the parties to brief the issues, and giving defendants an opportunity to respond.

On May 20, 2002, plaintiff filed its amended complaint adding a claim for declaratory judgment. At the May 23, 2002, hearing,

---

[3]Defendants apparently produced their documents on May 2, 2002, after an order and a reprimand by the NASD panel.

[4]The record does not specify the date on which the panel heard the jurisdictional challenge; it appears to have been during the May 6-10, 2002, hearings.

[5]The arbitration panel considered arguments similar to those presented here. Washington Square denied the panel had jurisdiction under the NASD Arbitration Code. It claimed the individual investors were not Washington Square customers, because they did not sign a customer agreement. Plaintiff claimed the investors worked with Henderson in his individual capacity, and not as its representative. The investors replied that Washington Square had waived a jurisdictional challenge by declining to make the challenge earlier. The investors also claimed they were, in fact, Washington Square customers and covered by NASD Rule 10301(a).

the Court heard argument on the later-filed complaint, rather than the documents previously considered.  The Court declined to issue the requested injunction, and reserved the right to issue this opinion.

The parties returned to arbitration on May 29.  On July 15, 2002, the panel issued its award.

III.  Personal Jurisdiction

A federal court must always first determine whether it has personal jurisdiction over the parties.  See Wessels, Arnold & Henderson v. Nat. Med. Waste, 65 F.3d 1427, 1431 (8th Cir. 1995) (personal jurisdiction is a "threshold issue for the Court").  Under the amended pleadings, the Court has personal jurisdiction. Washington Square's amended complaint seeks a declaratory judgment of non-liability under Section 10 and Rule 10(b)(5) of the Exchange Act.  This securities count allows personal jurisdiction over defendants.

When enacting 15 U.S.C. § 78aa, Congress expanded personal jurisdiction for certain securities disputes.  This statute gives a federal district court jurisdiction over any defendant who establishes minimum contacts with the United States, as opposed to contacts with a particular state.  See 15 U.S.C. §78aa; see also United Liberty Life Ins. Co. v. Ryan, 985 F.2d 1320, 1330 (6th Cir. 1993); Kansas City Power & Light Co. v. Kansas Gas & Elec. Co., 747 F. Supp. 567 (W.D. Mo. 1990) (applying securities statute to plaintiff's action for declaratory judgment).  Although defendants reside in West Virginia, their securities related matters occurred

4

within the United States; as such, this Court has personal jurisdiction.

Defendants argue that, at most, § 78aa's extended jurisdiction applies to plaintiff's declaratory judgment action, but not over the motion to enjoin arbitration. Defendants claim the Court must apply the regular personal jurisdiction analytic -- using the traditional minimum contacts framework -- to plaintiff's individual claims. Defendants are incorrect.

Defendants offer the case of <u>Paulucci v. William Morris Agency, Inc.</u>, 952 F. Supp. 1335, 1341 (D. Minn. 1997) to support this position, but the case is inapposite. <u>Paulucci</u> considers a distinctly different personal jurisdiction question. It analyzes a limiting exception to Minnesota's long-arm statute. Under this special exception, a Court must consider the nexus between each cause of action and the state. <u>See id.</u> As the Court noted in <u>Paulucci</u>, the "case presents one of the statute's anomalies, and falls outside 'most' . . . jurisdictional questions." <u>See id.</u> at 1342.

The case before the Court is different. This federal statute broadens -- as opposed to narrows -- jurisdiction. The Court need not, therefore, consider the appropriateness of jurisdiction under the traditional minimum contacts test.

IV.   <u>Venue</u>

A.   <u>Venue: 15 U.S.C. § 78 aa</u>

Defendants next claim this case is improperly venued. Plaintiff replies that venue is appropriate under an expansive

5

exception to § 1391(a), Section 27 of the Exchange Act of 1934.
The section reads, in relevant part:

> Any suit or action to enforce any liability or duty
> created by this chapter or rules or regulations
> thereunder, or to enjoin any violation of such chapter or
> rules or regulations, may be brought in any such district
> [wherein any act or transaction constituting the
> violation occurred] or in the district wherein the
> defendant is found or is an inhabitant or transacts
> business.

15 U.S.C. § 78aa.

Plaintiff has not shown, however, how its action is covered by
the text of this statute.  A declaratory action to prevent an
arbitration is a different beast from that which the statute
facially covers:  a suit or action to enforce liabilities or enjoin
violations.  See Oxford First Corp. v. PNC Liquidating Corp., 372
F. Supp. 191, 197 (E.D. Pa. 1974) (interpreting venue provision
expansively in case of organizational wrongdoing); cf. Emerson
Elec. Co. v. Black and Decker Mfg., Co., 606 F.2d 234 (8th Cir.
1979) (finding special patent infringement venue provisions do not
apply to declaratory judgment actions).

While a broad venue provision serves the salutary goal of
providing investors and small market participants with greater
access to multiple fora, plaintiff's interpretation would give
large investment firms the power to shanghai individual investors
from their local communities and force them into distant states.
This does not square with the statute's purpose, as recognized by
the United States Supreme Court.  That Court found the provision
"applicable to the broad universe of potential defendants subject
to the prohibitions of the Act," and that it facilitates "fair and

honest mechanisms for the pricing of securities and to assure that dealing in securities is fair and without undue preferences or advantages among investors . . . by enabling suits to enforce rights created by the Act to be brought wherever a defendant could be found." See Radzanower v. Touche Ross & Co., 426 U.S. 148, 154-56 (1976) (emphasis added).

The Court, therefore, rejects plaintiff's venue choice, insofar as it is premised on 15 U.S.C. § 78aa, because plaintiff's action falls within neither the text nor the purpose of the securities statute. The Court, however, must also consider whether venue is appropriate under 28 U.S.C. § 1391(a).

B. Venue: 28 U.S.C. § 1391

Plaintiff, alternatively, claims venue is proper under sections 1391(a) and (b)(2) which state, "A civil action . . . may . . . be brought in . . . a judicial district in which a substantial part of the events or omissions giving rise to this claim occurred." See 28 U.S.C. § 1391. Washington Square notes defendants claim the company's Minnesota-based compliance office improperly supervised and trained Henderson, rendering venue appropriate in this district. Plaintiff points to no fewer than five witnesses who worked in its Minneapolis office who have been identified on the arbitration witness list as further evidence of events or omissions occurring here.

This district's suitability as a forum is a close question. But plaintiff has shown that defendants' failure to supervise, fraudulent concealment, breaches of fiduciary duty, and common law

fraud occurred in Washington Square's Minneapolis office.  Because these acts or omissions arguably occurred in Minnesota, this is an appropriate venue.

    C.   <u>Transfer of Venue:  28 U.S.C. § 1404(a)</u>

    Defendants ask the Court to transfer this matter to the Western District of Pennsylvania.  They have selected the Western District because they believe it to be the only location where they can seek to compel arbitration under the Federal Arbitration Act ("FAA").  <u>See</u> <u>Merrill Lynch Pierce Fenner & Smith, Inc. v. Lauer</u>, 49 F.3d 323, 327 (7th Cir. 1995) (interpreting section 4 of the FAA to require a geographic link between the situs of the arbitration and the forum compelling arbitration).

    The change of venue statute, 28 U.S.C. § 1404(a), provides that "[f]or the convenience of the parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought."  Here, no single venue best serves the convenience of either the parties or witnesses.  <u>See, e.g.,</u> <u>Terra Int'l v. Mississippi Chem. Corp.</u>, 119 F.3d 688, 691 (8th Cir. 1997) (stating that, in determining venue, the Court should consider the statutory factors, as well as the unique features of the dispute, on a case-by-case basis).  While a change of venue to a forum capable of compelling arbitration might be required given a different set of facts, the arbitration is already completed.  In this case, there is no reason to believe the alternative forum requested would be better able to address the issues before the Court.

V.  Injunctive Relief

Because plaintiffs seek a preliminary injunction or a temporary restraining order, the Court applies the Dataphase factors.  See Dataphase Sys., Inc. v. C. L. Sys., Inc., 640 F.2d 109, 114 (8th Cir. 1981).  When extraordinary relief is requested, the moving party bears the burden of showing the injunction should issue.  See Local Union No. 884 v. Bridgestone/Firestone, 61 F.3d 1247, 1351 (8th Cir. 1995).  This is a case where plaintiff asks the Court to enjoin an arbitration which has been proceeding for nearly two years.

A.  Irreparable Injury to the Plaintiffs

The first Dataphase factor requires the Court to consider the threat of irreparable harm to plaintiff.  See 640 F.2d at 114. Washington Square claims it will be irreparably deprived of its constitutional right to a jury trial should this Court permit arbitration to continue.  While the constitutional right to a jury trial is fundamental, it can clearly be waived by an agreement to arbitrate.  Through NASD Rule 10301(a), NASD member firms waive trial by jury and agree to submit disputes to arbitration.  Cf. Koveleskie v. SBC Capital Mkts., Inc., 167 F.3d 361, 368 (7th Cir. 1998) (consent to arbitration waives right to jury trial).

Through its arguments, Washington Square is trying to have it both ways; in fact, it is trying to have things several ways, and all in its favor:

- The company first denies having any written agreement
  to arbitrate with these defendants; so, it argues, there

9

should be no arbitration.

• Washington Square next claims the arbitral panel is considering whether, in the absence of the written agreement, the defendants' relationship with Henderson, its registered representative, imposes upon it the duty to arbitrate. It claims the answer is "No."

• But at the same time, as seen above, Washington Square asks this Court to consider defendants' claims as conferring upon it the right to sue the defendants in this Court, even as it claims it has no relationship with the defendants. It makes this request <u>as if it had been a party to the signed agreement</u>. The company's claims of jurisdiction and Minnesota venue are made as if the company were a party to the signed contract it denies exists.

Washington Square's problem is that is denies contractual relationship with these defendants, but it desires the rights it would have if a contract were in place. Ultimately it would like the benefits, but not the liabilities, inherent in a brokerage agreement.

So the Court considers Washington Square's ultimate claimed injury, that the arbitration panel, rather than a jury, will decide whether the dispute is arbitrable. Even this position is undermined, however, by the fact that Washington Square has been engaged in the arbitration for almost two years. This seems a slender reed upon which to claim irreparable injury, thus invoking

10

this Court's emergency powers.   Under these circumstances, any
injury claimed by plaintiff is tentative and hypothetical in the
extreme, and provides an insufficient basis upon which to grant
equitable relief and enjoin the arbitration proceedings.

    B.   <u>Balance of Hardship on the Parties</u>

Washington Square's repeated argument is that it faces an
unfair burden if forced to continue in arbitration and accept the
decision of the panel.   <u>See Dataphase Sys., Inc.</u>, 640 F.2d at 114.
It suggests it is confronted by the burdens of fighting with the
investors on two fronts:  in the Pennsylvania arbitration, and in
Minnesota federal court.

The problem with this argument is obvious:  Washington Square
now faces duplicative litigation because it chooses to file this
federal lawsuit after almost two years' involvement in the
arbitration.   Setting aside the question of laches, Washington
Square's entry into the second front is, first, its own choice, and
second, tardy.

Under <u>Dataphase</u>, Washington Square's hardships, such as they
are, must be contrasted with those which an injunction will impose
on the defendants -- the non-moving parties.  As an initial matter,
the Court notes that the defendants are elderly individuals
residing in West Virginia.   Those capable of travel have already
participated in the Pittsburgh arbitration.

An order vacating that proceeding in favor of a newly-filed
Minnesota lawsuit will impose a far greater economic burden on
defendants than will be borne by the far larger plaintiff

corporation.   Washington Square, with its formidable financial assets and national scope, can easily bear the cost of completing the arbitration in which it has been engaged until this date.   The same cannot be said for these investors who have -- at least according to their claims -- lost significant sums due to the perfidy of Mr. Henderson.   See <u>Lyon Fin. Serv. v. PowerNet, Inc</u>., 2001 U.S. Dist. LEXIS 20193 (D. Minn. Nov. 19, 2001) (balancing financial burden to compare hardship).

Finally, the Court recognizes the loss which might be imposed on the adjudicative process – the Pennsylvania arbitration panel. This panel has invested over a year on these proceedings, and has held more than a week's hearings on the merits of the investor's claims.   It has expended significant energy into reaching a thoughtful outcome to its adjudication. Plaintiff's request merely compounds the expense and energy already spent on this set of claims, without avoiding any immediate or clear injury.

From the forgoing, it is clear the balance of harms strongly favors denial of the requested relief.

C.   <u>Likelihood of Success on the Merits</u>

The parties agree the NASD's Rules require arbitration of any "dispute, claim or controversy . . . between a customer and a member and/or associate person arising in connection with the business of such member or in connection with activities of such associated persons."   <u>See</u> NASD Rule 10301(a).   To demonstrate a likelihood of success on the merits, as required by <u>Dataphase</u>, 640 F.2d at 114, Washington Square must demonstrate not only that this

Court has the sole authority to determine whether the dispute
should be arbitrated, but also whether this dispute falls beyond
the ambit of NASD Rule 10301(a).

      1.  <u>Arbitrability</u>

      "Arbitration is a matter of contract and a party cannot be
required to submit to arbitration any dispute which he has not
agreed to so submit." <u>See AT&T Techs. v. Communications Workers of
Am.</u>, 475 U.S. 643, 648 (1986).  In <u>John Hancock Life Insurance Co.
v. Wilson</u>, a case virtually identical to the case at bar, the
Second Circuit Court of Appeals considered arbitrability when
investors had not independently contracted for NASD arbitration
with the investment firm.  <u>See</u> 254 F.3d 48 (2d Cir. 2001).

      The Second Circuit found that absent a "clear and unmistakable
intent to submit the issue of arbitrability to the arbitrators,"
the decision, as to arbitrability, remains with the Court.  <u>See</u> <u>id.</u>
at 53.  Having so decided, the Court interpreted the NASD rule to
require arbitration, and upheld the underlying trial court order
compelling arbitration.   In <u>Vestax Securities Corporation v.
McWood</u>, another case examining whether investor claims against a
securities firm are subject to arbitration, the Sixth Circuit Court
of Appeals also found the courts had the authority to determine
arbitrability and granted a motion to compel arbitration.  <u>See</u> 280
F.3d 1078 (6th Cir. 2001).[6]

      Here, the parties have already submitted the question of

---

     [6]The Sixth Circuit Court also upheld the trial court's
decision dismissing the investment firm's motion for declaratory
judgment against the investors.  <u>See</u> <u>id.</u>

arbitrability to the Pennsylvania panel.  That panel found it had jurisdiction over the matter, and that the dispute was arbitrable. Two Circuits have decided this question is for the courts; but, after each had found the question was for the courts, deferred in favor of arbitration.  In this case, where the parties have already submitted this question to the arbitration panel, the Court finds it reasonable to allow the matter to proceed in the arbitral forum.

While both the Second and Sixth Circuits found the arbitral decision rests with the Court, neither confronted a situation where the arbitration had been in process for more than one year, or where the arbitral panel had already heard the question of arbitrability.  Both Circuits' ultimate decision upheld trial court orders compelling arbitration.  Considering all of these factors, the Court finds the arbitration panel's decision in this case appropriate.

### 2.  Are Defendants Customers?

Plaintiff asks the Court to find defendants were not customers within the contemplation of NASD Rule 10301(a), or that the dispute did not arise in connection with its securities business. Plaintiff further asks the Court to consider extrinsic evidence to be offered by a drafter of the NASD rules.  Plaintiff proffers this evidence in the wake of a bit of obiter dicta inserted by Judge Katzmann in his concurrence in <u>John Hancock</u>, 254 F.3d at 61.  Judge Katzmann noted the absence of any rules-drafter testimony concerning the Rules' definition of "customer."  In the absence of such testimony, he conjectured that it might shed light on the

14

questioned Rule's meaning.[7]

While this Court is loathe to disregard the teaching of an appellate court, one concurring judge's musing on what might have been is hardly the stuff of stare decisis. There does not seem to be a need to puff on a 20-some-year-old dying ember recollection of one of heaven-knows-how-many NASD Rule drafters. Such an effort scarcely generates any heat, let alone offers any light on the subject.

Federal case law plainly states that "when the investor deals with an agent or representative [of a member], the investor deals with the member, and on that basis the investor is entitled to have resolved in arbitration any dispute that arises out of that relationship." Vestax Sec. Corp., 280 F.3d at 1081. And Vestax makes clear the investors need not be direct customers of the NASD member -- here Washington Square -- in order to invoke Rule 10301(a)'s arbitration protections. See id. In applying the Rule, federal courts have found "the fact that defendants [the investors] never opened accounts with plaintiff [] irrelevant." See Vestax Sec. Corp. v. Skillman, 117 F. Supp. 2d 654, 657 (N.D. Ohio 2000) aff'd 280 F.3d 1078 (6th Cir. 2001); WMA Sec., Inc. v. Wynn, 2002 U.S. App. LEXIS 6247 (6th Cir. April 1, 2002) (unpublished) (finding investment firm's lack of knowledge about both customers and transactions, and the absence of contract do not negate customer status).

_____

[7]At the May 23, 2002 hearing, plaintiff offered the Court the live testimony of one such NASD Rules drafter.

15

Plaintiff fervently asserts defendants' non-customer status. But other than lofting up the extrinsic statement of the NASD drafter, tenders no case law in support of its position.   This Court finds the Rule's language unambiguous, and therefore, sees no need for extrinsic evidence on the point.   There is nothing arcane, abstruse or abstracted about the term customer, nor is there evidence that it is a complicated term of art.   The Court finds the plain language of the NASD Code, and reported decisions squarely considering the issue, considerably more compelling than testimony of one drafter's idea of a term's meaning.

In this case, there does not appear to be a dispute over the fact that defendants used Henderson's services to purchase securities -- Henderson was a Washington Square registered representative.   The short version of Washington Square's argument is that "Henderson is a thief but not our thief."   If this Court were to accept Washington Square's argument and deny defendants a chance to arbitrate this dispute, it would place an unreasonable, unintended burden on the investing public.   The customers are not the ones who will usually know the vagaries of the mechanisms by which a person becomes involved with the brokerage firm, rather than the stockbroker individually.   It is not they who train the stockbroker or put him in an office.

While certainly not opining on the final outcome of the case, Washington Square seems to be asking the Court to impose a very high degree of control on the investors, when it seems far more reasonable to place the burden of controlling stockbrokers upon the

brokerage firm with which they are affiliated.  It is, typically, the brokerage firm's duty to exercise supervision over registered representatives.  As noted by a district court in the Northern District of Illinois:

> Defining customers to include not only those who executed purchases with member firms, but also those who maintained a less formal business relationship at the time of the alleged misconduct, furthers . . . policy and recognizes market reality . . . .  The sale of securities is usually a rather complex and convoluted transaction which requires the expertise and the involvement of several parties to succeed.

Lehman Bros. Inc. v. Certified Reporting Co., 939 F. Supp. 1333 (N.D. Ill. 1996).

When a broker is alleged to have committed fraud and other wrongdoing, it is quite conceivable that monies would be misappropriated or wrongly invested, and would therefore not travel through Washington Square's regular accounts.  The defendants claim they established accounts with Henderson, a licensed representative, and purchased securities on his recommendation. For these purposes, the Court considers them to be customers of a Washington Square-associated person, and therefore, customers of Washington Square.  See WMA Sec., 2002 U.S. App. LEXIS 6247 (unpublished).

3.  Does Dispute Involve Plaintiff's Business?

During the arbitration proceedings, defendants have claimed, among other things, that plaintiff failed to properly supervise Henderson, and that they have suffered from violations of state and federal securities law, breaches of fiduciary duty, and breaches of contract relating to securities sales.  Both the Second and Sixth

Circuits have found such a claim, when asserted against a brokerage firm alleged to have failed to properly supervise, "arises in connection with its business." See Vestax Sec. Corp., 280 F.3d at 1082, quoting John Hancock, 254 F.3d at 58-59; see also Vestax, 117 F. Supp. 2d at 657-58. John Hancock, like this case, deals specifically with the sale of fraudulent promissory notes. For these reasons, and for the purposes of this motion, the Court considers that this case involves plaintiff's business and is covered by Rule 10301(a).

As a result, applying the third Dataphase factor, the Court cannot find that Washington Square has shown arbitration is improper in this case or that it is likely to succeed on the merits on this point. This determination counsels against the Court's issuance of the requested injunction.

D.  Public Interest

Finally, the Court considers the public interest.  See Dataphase Sys., Inc., 640 F.2d at 114.  The Court finds the public interest does not support issuing the requested emergency relief.

Allowing the more-than-a-year-old arbitration to proceed is fully consistent with federal policy regarding arbitration.  This decision also comports with the securities policy embodied in NASD Rule 10301(a).  See, e.g., Vestax Sec. Corp., 280 F.3d at 1082-83. Lastly, given the investment of NASD resources in this dispute, it seems the public interest would be favored by avoiding a situation where two separate adjudicative bodies decide the same issue.

18

IV.   Conclusion

Having considered all of the Dataphase factors and finding that all four disfavor the grant of emergency relief, and given the facts and information presently available, the Court finds no basis upon which to invoke its emergency powers.

Accordingly, IT IS ORDERED that:

1.   Plaintiff's motion for a temporary restraining order [Docket No. 2] is denied.

2.   A preliminary injunction is denied.

Dated:   August 9th, 2002

JAMES M. ROSENBAUM
United States Chief District Judge

19